UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAWRENCE ANDERSON,

          Plaintiff,

v.

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

          Defendant.

_____/

Case No. 2:20-cv-10146

HONORABLE STEPHEN J. MURPHY, III

## OPINION AND ORDER
## DENYING PLAINTIFF'S MOTION FOR JUDGMENT [10]
## AND GRANTING DEFENDANT'S MOTION FOR JUDGMENT [11]

Plaintiff sued Defendant under § 502(a)(1)(B) of the Employment Retirement Insurance Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to overturn a denial of short-term disability benefits. ECF 1, PgID 2–3. Plaintiff sought for the Court to award short-term and long-term disability benefits as well as require Defendant to investigate a waiver of life premium. *Id.* at 2; ECF 10, PgID 564. The parties each moved for a judgment on the administrative record. ECF 10, 11. The Court reviewed the briefs and finds that a hearing is unnecessary. *See* E.D. Mich. LR 7.1(f). For the following reasons, the Court will grant judgment for Defendant and against Plaintiff.

### BACKGROUND

Plaintiff's employer provided him with short-term and long-term disability benefits issued by Defendant. ECF 9-1, PgID 27, 33 (short-term disability) (under

1

seal)[1]; ECF 9-2, PgID 170 (long-term disability). Since 2013, Plaintiff's primary work tasks required driving a hi-lo (forklift) and Tugger (an electric cart used to pull heavy cargo). ECF 1, PgID 3; ECF 9-2, PgID 168. The Department of Labor guidelines consider Plaintiff's tasks as light work. ECF 9-1, PgID 78. In that category, Plaintiff may need to do significant walking and standing or push arm and leg controls while he is sitting. *Id.* at 166.

For several years, Plaintiff has been treated for issues related to diabetes. ECF 9-2, PgID 171, 184, 211, 217. In June 2017, Plaintiff had a neurology consult at the Veteran Affairs ("VA") hospital, which resulted in a report that Plaintiff suffered from morbid obesity, diabetes mellitus, hypertension, and neuropathic pain. *Id.* at 211. Apart from pain, Plaintiff reported numbness, burning, and tingling in his feet that began several years before the pain and worked up to his mid-calves and his hands. *Id.*

In February 2018, Plaintiff visited a new primary care physician who diagnosed him with hypertension, type 2 diabetes mellitus, hyperlipidemia, coronary artery disease, renal dysfunction, cough, and anemia. *Id.* at 195. But none of those conditions or symptoms were new to Plaintiff or appeared to worsen over time. *Compare id.* at 195–96 *with id.* at 211–13.

At the follow-up appointment—and without conducting any medical tests— Plaintiff's primary care physician stated that he would begin filling out Family and Medical Leave Act ("FMLA") paperwork for Plaintiff. *Id.* at 188. And at that

---

[1] ECF 9, 9-1, 9-2, 9-3, 9-4, and 9-5 are all filed under seal.

appointment, Plaintiff informed his physician that he had felt dizzy for a year; the physician reported that Plaintiff had severe diabetic neuropathy in both feet and decreased vibratory sense in both feet. *Id.* The physician ordered several tests that included an EKG, glucometer, chest x-ray, and carotid doppler. *Id.*

In April 2018, Plaintiff had a nephrology consult at the VA, and it resulted in a finding that he suffered from stage 2 or 3 chronic kidney disease, diabetes mellitus with neuropathies, hypertension, and morbid obesity. *Id.* at 216. Apart from the diagnosis, the consult determined that his screening was "not as good as [the] prior" screening but there was "no need to change med[ications]." *Id.* at 215.

In August 2018, Plaintiff visited his primary care physician again. The physician reported that Plaintiff complied with all his treatment but never received a carotid doppler. *Id.* at 225. And in November 2018, Plaintiff met again with his primary care physician who treated him for sleep apnea. *Id.* at 204. The next month, Plaintiff met once more with his primary care physician who reported that Plaintiff complained of worsening pain in his feet and knees and a loss of balance, but that Plaintiff did not appear to be in acute distress. *Id.* at 203.

In January 2019, Plaintiff's primary care physician reported that Plaintiff had to take six months off work because of his diabetic neuropathy, type 2 diabetes, and stage 3 chronic kidney disease. *Id.* at 164. The physician explained that Plaintiff could not stand or walk for extended periods due to foot pain and loss of balance. *Id.* at 163. The physician therefore advised Plaintiff to not "walk, stand, sit, lift, [or] bend for

extended periods of time." *Id.* Shortly after, Plaintiff applied for short-term disability benefits. *Id.* at 161–63.

Defendant performed an in-house medical analysis the next month and reported that Plaintiff's primary care physician did not explain what had changed in the severity of Plaintiff's symptoms and treatment. ECF 9-4, PgID 405. The analysis recommended calling Plaintiff's primary care physician for more information. *Id.* Defendant's third-party medical vendor reached out to Plaintiff's doctor to discuss the diagnosis and treatment, but Plaintiff's doctor failed to respond. *Id.* at 380–81, 397. Defendant's physicians also tried calling Plaintiff's primary care physician several times, but all attempts failed. ECF 9-3, PgID 322–24, ECF 9-4, PgID 334–35. Eventually, Plaintiff's primary care physician informed Defendant that he would not discuss Plaintiff's diagnosis. *Id.* at 380.

In March 2019, Plaintiff met again with his primary care physician, but the notes from the visit are illegible. ECF 9-2, PgID 222. Then, in April 2019, Defendant denied Plaintiff's short-term disability claim because the available medical records "did not indicate that [the] claimed disabilities would preclude [him] from working for any amount of time." ECF 9-3, PgID 294.

To evaluate the benefits application, Defendant reviewed Plaintiff's medical records. *Id.* In that review, Defendant determined that no available clinical findings "supported a decline in gait or balance." *Id.* And Defendant found that no available records supported "any diagnostic testing measures [that] would support a decline in

functionality" or "the need for escalations in medical service, or conservative treatment measures." *Id.*

After the denial, Plaintiff had another neurology consult at the VA. ECF 9-2, PgID 213–14. The consult notes showed that Plaintiff denied joint, muscle, and foot pain, but that Plaintiff had a sore on his foot that he planned to discuss with his primary care physician. *Id.* at 214. When Plaintiff saw his primary care physician the next week, the physician noted that Plaintiff had experienced falling and pain. *Id.* at 227. But again, the appointment notes were largely illegible. *Id.* at 227.

In May 2019, Plaintiff's primary care physician reported again that Plaintiff could not work because of his medical conditions. ECF 9-3, PgID 230. The report stated that Plaintiff had degenerative joint disease in his knees, severe diabetic neuropathy in his feet, unstable angina, type 2 diabetes, and chronic kidney disease. *Id.* The report also explained that Plaintiff should not lift more than ten pounds, stand for long periods of time, operate foot powered controlled tools, or walk up or down stairs. *Id.* The report further explained that Plaintiff "walks with a cane" and he was beginning weekly knee injections and undergoing physical therapy once a week. *Id.*

In June 2019, Plaintiff met with his primary care physician. ECF 9-2, PgID 221. The appointment notes are illegible but seem to suggest that Plaintiff had pain and instability. *Id.* After, Plaintiff had another neurology consult at the VA, the notes of which stated that many of Plaintiff's diabetic neuropathy symptoms resembled the symptoms and diagnosis that he had reported at the neurology consult two years

prior. *Id.* at 212–13. The VA consult also reported that Plaintiff had fine finger movements, his heel/toe walk was intact, had full strength in all his muscle groups, and Plaintiff had normal gait. *Id.* at 213. And more, the neurology consult notes never referenced Plaintiff walking with a cane. *See id.* at 212–13.

A week after the neurology consult, Plaintiff met with his primary care physician whose appointment notes are illegible. *Id.* at 220. But the physician issued another report that essentially duplicated his May 2019 report. *Compare id.* at 230 *with id.* at 229.

In August 2019, the physician assistant ("PA") to Plaintiff's primary care physician reported that Plaintiff's "condition is worsening and during a flare up [Plaintiff] is unable to work." *Id.* at 236. According to the PA, Plaintiff experienced "extreme pain in both of his feet, numbness, and instability" during flare ups. *Id.* On top of that, Plaintiff experienced "periods of lightheadedness and dizziness." *Id.*

The next month, Plaintiff appealed the benefits denial. ECF 9-1, PgID 65, 79. Defendant then hired an independent physician to review the case. ECF 9-2, 144–50.

In October 2019, Plaintiff's primary care physician referred Plaintiff to physical therapy for damage in his right knee and difficulty walking. *Id.* at 208. The physical therapist noted that Plaintiff had pain and swelling in the right knee along with difficulty walking and standing. *Id.* at 207.

Later that month, after Defendant's independent physician unsuccessfully tried to contact Plaintiff's primary care physician twice, the independent physician drafted a report that explained Plaintiff's "host of comorbidities related to his chronic

Morbid Obesity . . . had not changed when [Plaintiff] went out of work . . . ." ECF 9-2, PgID148. More to the point, the reviewing doctor could not understand why Plaintiff's doctor required Plaintiff to take off work for six months when there is "not documentation of [Plaintiff's] worsening[,]" any "aggressive medication management," or an increase in "[emergency room] visits," or "interventional therapy/injections[.]" *Id.* at 148. And Plaintiff's noncompliance with physical therapy and diagnostic imaging was "inconsistent" with the severity of Defendant's claimed symptoms. *Id.* In the end, without medical evidence beyond Plaintiff's own reported symptoms, Plaintiff's baseline function had not changed to preclude him from work. *Id.* at 148–49.

Defendant then mailed Plaintiff a copy of the reviewing doctor's report so that Plaintiff could respond in writing before Defendant decided the appeal. ECF 9-1, PgID 81. After, Plaintiff saw the PA for his primary care provider who noted that Plaintiff used a cane and had trouble standing. *Id.* at 102. The PA also noted that Plaintiff's drug regimen had not improved his condition, but that Plaintiff did not appear to be in acute distress. *Id.* In any event, the PA further noted that Plaintiff had recently received a right knee injection and needed to monitor an ulcer on his foot. *Id.* at 103. But according to the PA, "there [were] no further [treatment] modalities for [Plaintiff's diabetic peripheral neuropathy] which would result in him . . . return[ing] to work." *Id.* at 102.

In November 2019, a reviewing doctor published an addendum that explained new information from Plaintiff's medical appointment that month did not change his

findings or conclusions for several reasons. *Id.* at 121. First, no in-office treatment occurred when Plaintiff complained about the ulcer on his foot. *Id.* Second, Plaintiff did not change his medication or receive prescriptions for pain. *Id.* Third, Plaintiff never underwent any laboratory analysis or diagnostic imaging, which suggested that Plaintiff's condition was not long-lasting. *Id.* Fourth, Plaintiff was advised to attend a follow-up appointment a week later, but there is no evidence that he did. *Id.* Last, the reviewing doctor again tried unsuccessfully to contact Plaintiff's primary care physician twice more. *Id.* at 122.[2]

After the addendum, Defendant denied the appeal. *Id.* at 77–84. During the appeal, Defendant reviewed more than two-years' worth of medical records. *Id.* at 78. In the denial, Defendant explained that the medical evidence failed to show that Plaintiff's medical conditions "would suddenly result in [Plaintiff's] inability to work for six months." *Id.* at 80. Given that Plaintiff had worked with the diagnoses for years without issue, Defendant denied the appeal because Plaintiff "would not be precluded from performing at least one of the material duties of [his] regular job." *Id.* at 80–81. Around the same time, Plaintiff informed Defendant that his request for social security disability insurance was also denied. *Id.* at 85. In January 2020, Plaintiff sued Defendant. ECF 1.

---

[2] Every time Plaintiff's primary care physician wrote a report to Defendant, the physician explained, "If you have any questions or concerns, please contact us at the number provided above or via fax." ECF 9-2, PgID 164; ECF 9-3, PgID 229–30, 236.

## STANDARD OF REVIEW

ERISA allows claimants to bring a civil action to recover benefits due to the claimant under the claimant's plan. *See* 29 U.S.C. § 1132(a)(1)(B). The Court reviews a denial of benefits claim under a de novo standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

As both parties explained, the Court must apply de novo review to the motions because Michigan law prohibits discretionary language in disability policies. ECF 10, PgID 547–48; ECF 11, PgID 576; *see Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 609 (6th Cir. 2009). Under a de novo review, the Court "determine[s] whether the [plan] administrator . . . made a correct decision." *Hoover v. Provident Life & Acc. Ins.*, 290 F.3d 801, 806 (6th Cir. 2002) (quotation omitted). In particular, the Court "must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998).

## DISCUSSION

The Court will first examine whether to overturn Defendant's denial of short-term disability benefits. The Court will then examine whether Plaintiff is entitled to long-term disability benefits.

I.    Short-Term Disability Benefits

The Sixth Circuit has explained that "[t]o succeed in his claim for disability benefits under ERISA, Plaintiff must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the Plan." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700–01 (6th Cir. 2014). Under the plan at issue here, "[d]isabled" means "because of an [i]njury or [s]ickness, a significant change in [Plaintiff's] mental or physical functional capacity has occurred . . . which . . . prevented [Plaintiff] from performing at least one of the Material Duties of [Plaintiff's] Regular Job." ECF 9-3, PgID 293. Essentially, Plaintiff must prove two things by a preponderance of the evidence: (1) an injury or sickness caused a significant change in Plaintiff's physical functional capacity and (2) that significant change prevented him from performing one material duty of his job. *See id.* Although a "significant change in . . . functional capacity" is not defined in the Plan, the plain language of the phrase "implies that a claimant underwent a major shift in [his] ability to function." *Counts v. United of Omaha Life Ins. Co.*, 429 F. Supp. 3d 389, 401 (E.D. Mich. 2019) (citations omitted).

Because the parties do not dispute the plan's terms, the Court's review is straightforward: the Court must examine the evidence in the administrative record and decide whether Plaintiff is "disabled" under the plan. *Conway v. Reliance Standard Life Ins. Co.*, 34 F. Supp. 3d 727, 732 (E.D. Mich. 2014). The Court's review must "take into account all the medical evidence, giving each doctor's opinion weight in accordance with the supporting objective medical evidence supporting the doctors'

opinions." *Bragg v. ABN AMRO N. Am., Inc.*, 579 F. Supp. 2d 875, 896 (E.D. Mich. 2008) (citing *Crider v. Highmark Life Ins. Co.*, 458 F. Supp. 2d 487, 505 (E.D. Mich. 2006)).

With that in mind, the Court need not give "special weight" to the treating doctor's opinion. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). And if the treating physician's opinion is unsupported by clinical records, then the Court will discount the opinion's weight. *White v. Standard Ins. Co.*, 895 F. Supp. 2d 817, 848 (E.D. Mich. 2012). The Court will now address whether Plaintiff proved by a preponderance of the evidence that he is entitled to short-term disability benefits.

To begin, Plaintiff's motion for judgment stressed several alleged shortcomings in Defendant's evaluation of the short-term disability claim. ECF 10, PgID 548–50, 554–63. Those arguments, however, are more appropriate to analyze a claim under an arbitrary and capricious standard of review, which, as the Court explained, does not apply here.

Defendant's motion for judgment suggested that the Court could find Plaintiff had failed to meet his burden of proof in one of two ways: either Plaintiff failed to prove a "significant change in his mental or physical capacity[,]" ECF 11, PgID 576–77, or Plaintiff failed to prove his damages, *id.* at 581. Analysis of Defendant's first point is dispositive.

To determine whether Plaintiff had a major shift in his ability to function, the Court must analyze several of Plaintiff's conditions. First, the Court will evaluate whether any symptoms related to Plaintiff's reported loss of balance and falling were

a major shift in his ability to function. Second, the Court will evaluate whether Plaintiff's foot and knee pain was a major shift in his ability to function. The Court will address the analysis in two separate sections because Plaintiff's primary care physician identified those specific changes to Plaintiff's functional capacity as reasons why Plaintiff could not work. ECF 9-2, PgID 162–64; ECF 9-3, PgID 229.

    *A. Loss of Balance and Falling*

The Court must evaluate the primary care physician's findings that Plaintiff suffers from dizziness, instability, loss of balance, and a gait abnormality. Plaintiff informed his primary care physician at his second appointment that he had a year-long bout of dizziness. ECF 9-2, PgID 188. Oddly, Plaintiff's medical records from the year before lack any record that suggested Plaintiff had suffered from dizziness. *See id.* at 211, 217. Still, the primary care physician scheduled Plaintiff for a carotid doppler test to figure out why Plaintiff felt dizzy for so long. *Id.* at 188. Plaintiff, however, never received the test that his primary care physician ordered. *Id.* at 225. And it appeared that the primary care physician did not follow up on the test. *See id.*

In any event, when Plaintiff eventually needed to take six more months off work, the PA for Plaintiff's primary care provider informed Defendant that Plaintiff could not work because he "may experience dizziness." ECF 9-3, PgID 236. But that statement contradicts what Plaintiff stated during his nephrology consult several months before. ECF 9-2, PgID 214. There, Plaintiff denied having any dizziness. *Id.*

Given that Plaintiff's medical records give contradictory accounts about Plaintiff's dizziness and that there are no clinical findings to support dizziness

symptoms, the Court will discount the PA's opinion that Plaintiff suffered from dizziness. *See White*, 895 F. Supp. 2d at 848 (citation omitted). And accordingly, Plaintiff has not met his burden by a preponderance of the evidence to show that his dizziness contributed to a major shift in his ability to function.

Next, Plaintiff's instability and loss of balance do not qualify him as disabled under the plan. Although Plaintiff's primary care physician documented Plaintiff's complaint about losing balance, the physician conducted no tests to measure Plaintiff's balance, gait, or movement. ECF 9-2, PgID 203. Indeed, the first time Plaintiff underwent testing was at the neurology consult six months later. *Id.* at 213. And the notes from the consult showed that Plaintiff's motor functions had "no tremor [or] drift[,]" his "heel/toe walk [was] intact[,]" he had full strength of his muscle groups, and he had a normal gait. *Id.*

That said, evidence that first showed Plaintiff had instability and a loss of balance was the primary care physician report of May 2019—a month before the neurology consult—that Plaintiff "walks with a cane." ECF 9-3, PgID 230.[3] But Plaintiff has offered no evidence to explain why the cane was medically necessary. Granted, the evidence showed that Plaintiff had a sore on his foot. For instance, the neurology consult had noted that Plaintiff planned to discuss the sore on his foot with his primary care physician. ECF 9-2, PgID 214. But that sore had been around since

---

[3] In October 2019, a physical therapist stated that Plaintiff had "[d]ifficulty walking and standing." ECF 9-2, PgID 207. But the Court need not give "special weight" to the physical therapist's opinion especially when that opinion is unsupported by clinical records. *Black & Decker Disability Plan*, 538 U.S. at 834; *White*, 895 F. Supp. 2d at 848 (citation omitted).

November 2018 and was unchanged for months. *Id.* And there are no notes from the neurology consult that suggest Plaintiff was walking with a cane despite the foot sore. See *id.* at 212–14.

Nor is there any evidence that the foot sore required Plaintiff to walk with a cane. Plaintiff's primary care physician documented no foot sore in the months right after Plaintiff started walking with a cane. ECF 9-2, PgID 207 (physical therapist in October); ECF 9-2, PgID 220 (primary care June appointment); ECF 9-3, PgID 236 (primary care August letter). The first time that the primary care physician noted the foot sore was several months later in October 2019. ECF 9-1, PgID 103. And even then, no evidence showed the sore (ulceration) caused a major shift in Plaintiff's ability to function because Plaintiff did not undergo any outpatient treatment for it at his primary care physician's office. *Id.*

Without supporting objective medical evidence, the Court cannot find that the cane was medically necessary for Plaintiff to walk and the Court must discount the primary care physician's finding that Plaintiff was suffering from instability and loss of balance. *Bragg*, 579 F. Supp. 2d at 896 ("[T]he Court is to take into account all of the medical evidence, giving each doctor's opinion weight in accordance with the supporting objective medical evidence supporting the doctors' opinions."). In all, Plaintiff has not shown by a preponderance of the evidence that he suffered from a loss of balance or instability that would qualify as a major shift in his ability to function.

Last, Plaintiff's gait abnormality also does not qualify him as disabled under the plan. The first time any medical notes documented Plaintiff's gait abnormality was in October 2019. ECF 9-1, PgID 107 (PA noted that Plaintiff had an ataxic gait); *see also* ECF 9-2, PgID 207 (physical therapist noted that Plaintiff had "[d]ifficulty walking and standing"). But no notes explained what caused the ataxic gait. ECF 9-1, PgID 107. And the Court must weigh the ataxic gait finding while also considering that five months earlier the neurology consult found that Plaintiff had normal gait, his heel/toe walk was intact, and he had full muscle strength. ECF 9-2, PgID 213.

In any event, Plaintiff's assertion that his foot sore caused his ataxic gait is not supported by the evidence. Plaintiff received no treatment for it; he was told to monitor it and to stay off his foot. ECF 9-1, PgID 103. The ataxic gait could, however, be due to the "loss of pinprick, vibratory, pain and light touch sensation extending 3 inches above [the ankle]." *Id.* Yet that cause is unlikely because five months earlier at the neurology consult, Plaintiff had basically the same sensations. ECF 9-2, PgID 213. In sum, there is no medical reason why Plaintiff could have a normal gait and then five months later have an ataxic gait, other than the attending physician's conclusory finding.

Moreover, the PA made other observations from the October 2019 visit that are conclusory and lack supporting evidence. For one, the PA found that "there are no further [treatment] modalities for [Plaintiff's diabetic peripheral neuropathy] which would result in him being able to return to work." ECF 9-1, PgID 102. But as the Court has explained, that visit was the first time anyone documented Plaintiff

with an ataxic gait or the "loss of pinprick, vibratory, pain and light touch sensation[.]" *Id.* at 103; *see* ECF 9-3, PgID 249. The PA's opinion is conclusory—or at least premature—because the findings were the first of the symptoms and there was no lab analysis or diagnostic tests completed to support the opinion.

There is, however, a coincidence surrounding when the PA first documented these symptoms. Before the appointment, Defendant let Plaintiff review the initial opinion by Defendant's independent physician who reviewed the short-term disability claims. ECF 9-1, PgID 95. At the time, Plaintiff had "wanted to know what was [sic] the reviewer missing as to why his claim can't be approved." *Id.* So Defendant informed him that the independent physician who reviewed his claims "ha[d] listed each of his conditions and ha[d] given [a] rationale as to why each condition is not supported." *Id.*

The independent physician's opinion identified several shortcomings behind Plaintiff's diagnosis. One was that later exams did "not further elaborate or quantify . . . sensation, temperature, pinprick, vibratory, balance issues, or gait abnormalities." ECF 9-2, PgID 144, 147. Then, one day after Plaintiff received the report, ECF 9-1, PgID 96, Plaintiff saw his primary care physician's PA who then made the very findings that Defendant's independent physician had found were lacking from prior exams. *Compare id.* at 106–07 (primary care physician notes) *with* ECF 9-2, PgID 144–49 (independent physician report). The Court must discount the PA's opinion because there is little evidence to support the ataxic gait finding and the opinion is conclusory without clinical records to support it. *See White*, 895 F. Supp.

2d at 848 (citation omitted). In short, Plaintiff did not prove by a preponderance of the evidence that Plaintiff's gait abnormality contributed to a major shift in his ability to function.

In all, Plaintiff has not shown by a preponderance of the evidence that any instability, loss of balance, or difficulty walking contributed to a major shift in his ability to function.

### B. Foot and Knee Pain

For several years while Plaintiff worked as a hi-lo and Tugger driver, he lived with knee and foot pain. ECF 9-2, PgID 211. The first time that Plaintiff complained to his primary care physician about worsening pain was in December 2018. *Id.* at 203.

The primary care physician's notes from that appointment fail to suggest that Plaintiff was prescribed any medication or treatment for his worsening knee and foot pain. *See id.* Yet Plaintiff's primary care physician still determined that Plaintiff needed time off work because he advised Plaintiff to not "walk, stand, sit, lift, [or] bend for extended periods of time." *Id.* at 163.

After reviewing the medical records, the Court cannot find that Plaintiff's knee and foot pain as of January 2019—when Plaintiff filed for disability—made him disabled under his short-term disability plan. For one, Plaintiff's complaints about worsening pain appear precipitously. And if Plaintiff suffered from sudden worsening pain that would prevent him from working, no evidence showed that Plaintiff received pain medication or outpatient treatment to reduce the debilitating pain.

Instead, the evidence showed that Plaintiff was on Gabapentin (Graslise) for pain since 2017. *Id.* at 211. Then, before switching to his new primary care physician, Plaintiff started using Pregabalin (Lyrica), which helped with his pain and continued to help through June 2019. *Id.* at 212–13; *see also id.* at 195. Because the evidence shows that Plaintiff's primary care physician provided no treatment for Plaintiff's pain, the Court finds that physician's opinion about worsening pain strays from the supporting objective medical evidence. *See Bragg*, 579 F. Supp. 2d at 896 (citing *Crider*, 458 F. Supp. 2d at 505).

Indeed, it was not until May 2019 that Plaintiff's pain was treated with weekly knee injections and physical therapy. ECF 9-3, PgID 230. But there are no treatment records that show Plaintiff complied with either treatment: he received one knee injection and attended only two physical therapy sessions. ECF 9-2, PgID 103 (knee injection), 207 (physical therapy).

Beyond that, Plaintiff's own conduct undercuts the severity of his pain. For example, his primary care physician advised Plaintiff that he cannot "walk, stand, sit, lift, [or] bend for extended periods of time." *Id.* at 163. And despite that recommendation, Plaintiff informed Defendant shortly after seeing his doctor that he was going to the gym to lose weight. ECF 9-1, PgID 100. Moreover, at Plaintiff's neurology consult, Plaintiff denied any joint, muscle, or foot pain. ECF 9-2, PgID 214. But a week after the consult, Plaintiff told his primary care physician that he had pain. *Id.* at 227. Plaintiff contradicted his own subjective complaints about pain.

18

Put simply, Plaintiff has not proven by a preponderance of the evidence that he was "disabled" because of his foot and knee pain. The physician's finding of worsening knee and foot pain lack support from any clinical findings. And based on Plaintiff's own statements, he sometimes experienced no pain and he was not complying with his primary care physician's treatment recommendations. *Id.* at 214. Plaintiff has only produced scant objective evidence of pain and contradictory subjective evidence of pain. The Court therefore cannot find that Plaintiff's knee and foot pain caused a major shift in his ability to function. *Cf. Counts*, 429 F. Supp. 3d at 403 (finding that a plaintiff had shown "substantial 'objective' evidence of pain" through "unsuccessfully attempt[ing] an increasingly aggressive regimen of opioid medication, physical therapy, spinal injections, and surgery").

### *C. Short-Term Benefits Conclusion*

Because Plaintiff has not shown by a preponderance of the evidence that he has experienced a major shift in his ability to function, he is not "disabled" under the plan. The Court will therefore uphold Defendant's denial of short-term disability benefits.

## II.   Long-Term Disability Benefits

Ordinarily, plaintiffs must exhaust their administrative remedies before suing under § 1132(a)(1)(B). *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 504 (6th Cir. 2004). The Court will only excuse a failure to exhaust administrative remedies when "it would be futile to pursue an administrative remedy or such a remedy would be inadequate." *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 887 (6th Cir. 2020);

19

*see also Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998). But satisfying futility is a "high standard[.]" *Hitchcock v. Cumberland Univ. 403(b) DC Plan*, 851 F.3d 552, 560 (6th Cir. 2017).

In fact, a claim is futile when a plaintiff proves that "it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision." *Fallick*, 162 F.3d at 419 (citing *Lindemann v. Mobil Oil Corp.*, 79. F.3d 647, 650 (7th Cir. 1996)). And generally, futility applies only in two cases: (1) when plaintiffs assert questions about the plan's legality or (2) when plaintiffs challenge a defendant's authority to decide their claims. *Dozier v. Sun Life Assurance Co. of Can.*, 466 F.3d 532, 535 (6th Cir. 2006) (citations omitted).

Here, Plaintiff claimed that "[b]ecause the same evidence that supports short-term disability under the policy also supports the payment of long-term disability benefits, there is no reason to believe that [Defendant] would have offered a different decision on a long-term disability claim application." ECF 12, PgID 596. In other words, Plaintiff is asserting a claim outside the two scenarios in which the futility exception applies. *See Dozier*, 466 F.3d at 535.

At any rate, Plaintiff has not shown that "it is certain that his claim will be denied on appeal[.]" *Fallick*, 162 F.3d at 419 (citation omitted). For one, Plaintiff has not alleged that he was prevented from filing for long-term disability benefits. *See Welsh v. Wachovia Corp.*, 191 F. App'x 345, 358 (6th Cir. 2006) (holding that the futility exception applied because a plaintiff "was effectively precluded by the terms of the [long-term disability] Plan from apply for long-term disability benefits"). And

two, Plaintiff has not shown "that the review procedures [were] insufficient or unfair . . . ." *Ravencraft v. UNUM Life Ins. Co. of Am.*, 212 F.3d 341, 344 (6th Cir. 2000). Without either showing, the Court will not craft a new exception for Plaintiff under the futility doctrine because doing so would undermine the exhaustion requirement's purpose.

At its core, exhaustion allows "plan fiduciaries to . . . correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions." *Id.* at 343 (emphasis removed) (citation omitted). Plaintiff's failure to file a claim for long-term benefits necessarily meant that Defendant never had a chance to correct any errors, interpret the long-term benefits plan provision, or create a record for the Court to review.

In all, nothing about the plan's provisions or who adjudicated Plaintiff's claims precluded Plaintiff from filing for long-term benefits. *See Dozier*, 466 F.3d at 535.Because Plaintiff failed to exhaust the long-term benefits claim within the time specified under the plan, ECF 13-1, PgID 639, and has not made a futility showing, the Court will deny the claim with prejudice. *See Beamon v. Assurant Emp. Benefits*, 917 F. Supp. 2d 662, 668 (W.D. Mich. 2013) (finding that because "Plaintiff can no longer exhaust his administrative remedies[,]" a dismissal with prejudice was warranted). Dismissal with prejudice is warranted because Plaintiff needed to file a long-term benefits claim within ninety days after the Elimination Period (180 calendar days). ECF 13-1, PgID 638–39. Thus, Plaintiff's filing deadline was in September 2019 because Plaintiff claimed that his disability began in December

21

2018. *See id.* The Court will therefore dismiss Plaintiff's long-term benefits claim with prejudice. *See Gayle v. United Parcel Serv., Inc.*, 401 F.3d 222, 230 (4th Cir. 2005) ("Dismissal without prejudice is appropriate whenever a claim can still be brought. But since the pursuit and exhaustion of internal Plan remedies is an essential prerequisite to judicial review of an ERISA claim for denial of benefits . . . and since this is impossible here, [Plaintiff's] claims are barred.").

ORDER

**WHEREFORE**, it is hereby **ORDERED** that Plaintiff's motion for judgment [10] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's motion for judgment [11] is **GRANTED**.

**IT IS FURTHER ORDERED** that the claims are **DISMISSED WITH PREJUDICE**.

This is a final order that closes the case.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: February 17, 2021

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 17, 2021, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager